Reversed by Supreme Court on June 26, 2000.
No. 99-5525, Dickerson v. United States

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.

CHARLES THOMAS DICKERSON,

No. 97-4750

Defendant-Appellee.

WASHINGTON LEGAL FOUNDATION;
SAFE STREETS COALITION,
Amici Curiae.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CR-97-159-A)

Argued: January 30, 1998

Decided: February 8, 1999

Before WILLIAMS and MICHAEL, Circuit Judges, and
KISER, Senior United States District Judge for the
Western District of Virginia, sitting by designation.

_____

Reversed and remanded by published opinion. Judge Williams wrote
the opinion, in which Senior Judge Kiser joined. Judge Michael wrote
an opinion concurring in part and dissenting in part.

_____

**COUNSEL**

**ARGUED:** Vincent L. Gambale, Assistant United States Attorney,
Alexandria, Virginia, for Appellant. Paul George Cassell, College of

Law, UNIVERSITY OF UTAH, Salt Lake City, Utah, for Amici Curiae. James Warren Hundley, BRIGLIA & HUNDLEY, Fairfax, Virginia, for Appellee. **ON BRIEF:** Helen F. Fahey, United States Attorney, William G. Otis, Senior Litigation Counsel, Justin W. Williams, Assistant United States Attorney/Chief, Criminal Division, Robert A. Spencer, Assistant United States Attorney, Alexandria, Virginia, for Appellant. Daniel J. Popeo, Paul D. Kamenar, WASHINGTON LEGAL FOUNDATION, Washington, D.C., for Amici Curiae.

_____

## OPINION

WILLIAMS, Circuit Judge:

In response to the Supreme Court's decision in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), the Congress of the United States enacted 18 U.S.C.A. § 3501 (West 1985), with the clear intent of restoring voluntariness as the test for admitting confessions in federal court. Although duly enacted by the United States Congress and signed into law by the President of the United States, the United States Department of Justice has steadfastly refused to enforce the provision. In fact, after initially "taking the Fifth" on the statute's constitutionality, the Department of Justice has now asserted, without explanation, that the provision is unconstitutional. With the issue squarely presented, we hold that Congress, pursuant to its power to establish the rules of evidence and procedure in the federal courts, acted well within its authority in enacting § 3501. As a consequence, § 3501, rather than <u>Miranda</u>, governs the admissibility of confessions in federal court. Accordingly, the district court erred in suppressing Dickerson's voluntary confession on the grounds that it was obtained in technical violation of <u>Miranda</u>.

I.

On January 27, 1997, Charles T. Dickerson confessed to robbing a series of banks in Maryland and Virginia. Dickerson was subsequently indicted by a federal grand jury on one count of conspiracy to commit bank robbery in violation of 18 U.S.C.A.§ 371 (West Supp. 1998), three counts of bank robbery in violation of 18 U.S.C.A.

2

§ 2113(a) & (d) (West Supp. 1998), and three counts of using a fire-arm during and in relation to a crime of violence in violation of 18 U.S.C.A. § 924(c)(1) (West Supp. 1998). Shortly thereafter, Dicker-son moved to suppress his confession. Although the district court spe-cifically found that Dickerson's confession was voluntary for purposes of the Fifth Amendment, it nevertheless suppressed the con-fession because it was obtained in technical violation of Miranda.[1]

In ruling on the admissibility of Dickerson's confession, the district court failed to consider § 3501, which provides, in pertinent part, that "a confession . . . shall be admissible in evidence if it is voluntarily given." 18 U.S.C.A. § 3501(a). Based upon the statutory language, it is evident that Congress enacted § 3501 with the express purpose of legislatively overruling Miranda and restoring voluntariness as the test for admitting confessions in federal court. Thus, if Congress pos-sessed the authority to enact § 3501, Dickerson's voluntary confes-sion is admissible as substantive evidence in the Government's case-in-chief.

Congress enacted § 3501 as a part of the Omnibus Crime Control Act of 1968, just two years after the Supreme Court decided Miranda. Although the Supreme Court has referred to § 3501 as "the statute governing the admissibility of confessions in federal prosecutions," United States v. Alvarez-Sanchez, 511 U.S. 350, 351 (1994), the Court has never considered whether the statute overruled Miranda, see Davis v. United States, 512 U.S. 452, 457 n.* (1994). Indeed, although several lower courts have found that § 3501, rather than Miranda, governs the admissibility of confessions in federal court, see United States v. Crocker, 510 F.2d 1129, 1137 (10th Cir. 1975); United States v. Rivas-Lopez, 988 F. Supp. 1424, 1430-36 (D. Utah 1997), no Administration since the provision's enactment has pressed the point, see Davis, 512 U.S. at 463-64 (Scalia, J., concurring) (not-

_____

**1** The district court also suppressed the physical evidence obtained dur-ing the search of Dickerson's apartment because the warrant was not suf-ficiently particular in describing the items to be seized. Finding that the warrant was sufficiently particular in describing the items to be seized, see post part IV.A, or, in the alternative, that the officers executing the warrant acted in good faith, see post part IV.B, we reverse that ruling also.

3

ing that "the provision has been studiously avoided by every Administration . . . since its enactment more than 25 years ago"); see also U.S. Dep't of Justice, Report to Attorney General on Law of Pre-Trial Interrogation 72-73 (1986) (discussing "[t]he abortive implementation of § 3501" after its passage in 1968). In fact, after initially declining to take a position on the applicability of § 3501, see Davis, 512 U.S. at 457 n.*, the current Administration has now asserted, without explanation, that the provision is unconstitutional, see Letter from Janet Reno, Attorney General, to Congress (Sept. 10, 1997).

Recently, Justice Scalia expressed his concern with the Department of Justice's failure to enforce § 3501. See Davis, 512 U.S. at 465 (Scalia, J., concurring). In addition to "caus[ing] the federal judiciary to confront a host of `Miranda' issues that might be entirely irrelevant under federal law," id., Justice Scalia noted that the Department of Justice's failure to invoke the provision "may have produced -- during an era of intense national concern about the problem of run-away crime -- the acquittal and the nonprosecution of many dangerous felons," id. This is just such a case. Dickerson voluntarily confessed to participating in a series of armed bank robberies. Without his confession it is possible, if not probable, that he will be acquitted. Despite that fact, the Department of Justice, elevating politics over law, prohibited the U.S. Attorney's Office from arguing that Dickerson's confession is admissible under the mandate of § 3501.

Fortunately, we are a court of law and not politics. Thus, the Department of Justice cannot prevent us from deciding this case under the governing law simply by refusing to argue it. See United States Nat'l Bank of Or. v. Independent Ins. Agents of America, Inc., 508 U.S. 439, 445-48 (1993). Here, the district court has suppressed a confession that, on its face, is admissible under the mandate of § 3501, i.e., the confession was voluntary under the Due Process Clause, but obtained in technical violation of Miranda. Thus, the question of whether § 3501 governs the admissibility of confessions in federal court is squarely before us today.

Determining whether Congress possesses the authority to enact § 3501 is relatively straightforward. Congress has the power to overrule judicially created rules of evidence and procedure that are not required by the Constitution. See Carlisle v. United States, 517 U.S.

4

416, 426 (1996); Palermo v. United States, 360 U.S. 343, 345-48 (1959). Thus, whether Congress has the authority to enact § 3501 turns on whether the rule set forth by the Supreme Court in Miranda is required by the Constitution. Clearly it is not. At no point did the Supreme Court in Miranda refer to the warnings as constitutional rights. Indeed, the Court acknowledged that the Constitution did not require the warnings, 384 U.S. at 467, disclaimed any intent to create a "constitutional straightjacket," id., referred to the warnings as "procedural safeguards," id. at 444, and invited Congress and the States "to develop their own safeguards for [protecting] the privilege," id. at 490. Since deciding Miranda, the Supreme Court has consistently referred to the Miranda warnings as "prophylactic," New York v. Quarles, 467 U.S. 649, 654 (1984), and "not themselves rights protected by the Constitution," Michigan v. Tucker, 417 U.S. 433, 444 (1974). We have little difficulty concluding, therefore, that § 3501, enacted at the invitation of the Supreme Court and pursuant to Congress's unquestioned power to establish the rules of procedure and evidence in the federal courts, is constitutional. As a consequence, we hold that the admissibility of confessions in federal court is governed by § 3501, rather than the judicially created rule of Miranda.

II.

Because of the unique posture of this case, i.e. , an interlocutory appeal from the denial of a motion to reopen a suppression hearing, and the significant legal questions raised therein, we have set forth the factual background and the procedural history in painstaking detail. Although rather lengthy, we believe that it is helpful in understanding the important legal issues that must be addressed.

On January 24, 1997, an individual using a silver semi-automatic handgun and carrying a black leather bag robbed the First Virginia Bank in Old Town, Alexandria, Virginia, of approximately $876. An eyewitness saw the robber exit the bank, run down the street, and get into a white Oldsmobile Ciera with District of Columbia license plate number D5286. Within seconds, the robber exited the car, placed something in the trunk, and then re-entered the car on the passenger side. The car then drove away.

The subsequent investigation into the bank robbery revealed that the getaway car was registered to Charles T. Dickerson of Takoma

5

Park, Maryland. On January 27, 1997, approximately ten FBI agents and an Alexandria police detective (the agents) traveled to Dickerson's Takoma Park address. Upon arrival, the agents noticed a white Oldsmobile Ciera with D.C. license plate number D5286 parked on the street in front of Dickerson's apartment. Special Agent Christopher Lawlor knocked on Dickerson's door and identified himself. After some delay, Dickerson opened the door. Special Agent Lawlor informed Dickerson that the agents were investigating a bank robbery.

Although the parties dispute whether the agents had consent to enter Dickerson's apartment, there is no dispute that several agents did, in fact, do so. After a short conversation, Special Agent Lawlor asked Dickerson if he would accompany them to the FBI Field Office in Washington, D.C. Dickerson agreed,[2] but requested that he be allowed to retrieve his coat from his bedroom. As Dickerson picked up his coat, Special Agent Lawlor noticed a large amount of cash on the bed. After placing the money in his coat pocket, Dickerson told the agents that it was gambling proceeds from Atlantic City. After denying the agents' request to search his apartment, Dickerson rode with the agents to the FBI Field Office. Dickerson was not formally placed under arrest and was not handcuffed. Several agents, including Agent Lawrence Wenko, remained in the vicinity of Dickerson's apartment.

At the FBI Field Office, Dickerson was interviewed by Special Agent Lawlor and Detective Thomas Durkin of the Alexandria Police Department. Dickerson denied any involvement in the robbery, but admitted that he had driven to Old Town on the morning in question to look at a restaurant. While in the vicinity of the First Virginia Bank, Dickerson claims that he ran into an old friend named Terrance, who asked for a ride to Suitland, Maryland. Dickerson agreed, and drove Terrance to Suitland, where he dropped Terrance off near a liquor store.

Special Agent Lawlor left the interview room and called United States Magistrate Judge James E. Kenkel to obtain a warrant to search Dickerson's apartment. Based upon the tape-recorded conversation

---

[2] Dickerson testified at the suppression hearing that he did not feel he had a choice about whether to accompany the agents to the field office.

between Special Agent Lawlor and Judge Kenkel, it is undisputed that Special Agent Lawlor described the circumstances of the robbery, including that the robber used a handgun, carried a bag, requested unmarked bills, and left the scene in a car registered to Dickerson. In addition, Special Agent Lawlor noted that Dickerson had over $550 in cash when picked up, had just that day paid his landlord $1350 to cover back rent, and had admitted that he was near the bank at the time of the robbery. Finally, Special Agent Lawlor explained that he was seeking a telephonic warrant because Dickerson was not under arrest and could easily go home and destroy any evidence of the bank robbery.

Based upon Special Agent Lawlor's sworn statement, Judge Kenkel stated that he was convinced "that there is probable cause to believe at that residence there may be . . . evidence of . . . the bank robbery in question." (J.A. at 69.) In the section of the warrant used to identify the property to be seized, Special Agent Lawlor wrote: "Evidence of the crime of bank robbery." (J.A. at 66.) In the section of the warrant used to identify the time issued, Special Agent Lawlor wrote: "8:50 p.m."[3] (J.A. at 66.) Special Agent Lawlor then called Agent Wenko, who had remained in the vicinity of Dickerson's apartment, to inform him that a warrant had been issued authorizing the agents to search Dickerson's apartment for evidence of the First Virginia Bank robbery. Immediately after being notified about the warrant, Agent Wenko and a team of agents proceeded to search Dickerson's apartment.

After returning to the interview room, Special Agent Lawlor told Dickerson that agents were about to search his apartment. At some point thereafter, Dickerson informed Special Agent Lawlor and Detective Durkin that he wished to make a statement. In his statement, Dickerson admitted to being the getaway driver in a series of bank robberies. Dickerson then identified Jimmy Rochester as the actual bank robber. Of particular importance to this case, Dickerson

_____

[3] Because the warrant was obtained over the telephone, Judge Kenkel was not able to sign the warrant personally. Instead, Judge Kenkel instructed Special Agent Lawlor to sign the Judge's name, followed by a slash and Special Agent Lawlor's name, on the line used to identify the name of the judicial officer authorizing the warrant.

told the agents that on January 24, 1997, the pair drove to Old Town, Alexandria. Dickerson admitted that he stopped the car near the First Virginia Bank, that Rochester got out of the car, that Rochester returned a short while later and placed something in the trunk, that Rochester got back in the car, and that the pair drove away. Dickerson also told the agents that Rochester gave him a silver handgun[4] and some dye-stained money that Rochester feared the police might find in his apartment. Following these statements, Dickerson was placed under arrest.

As a result of Dickerson's confession, Rochester was apprehended by the police and placed under arrest. At that time, Rochester admitted to robbing eleven banks in Georgia, three banks in Virginia (including the First Virginia Bank in Old Town, Alexandria), four banks in Maryland, and an armored car in Maryland. Of particular importance here, Rochester stated that Dickerson was his getaway driver in each of the Maryland and Virginia bank robberies.

The search of Dickerson's apartment produced a silver .45 caliber handgun, dye-stained money, a bait bill from another robbery, ammunition, masks, and latex gloves. The agents also found a small quantity of drugs in plain view. A subsequent warrant-authorized search of Dickerson's Oldsmobile Ciera produced a black leather bag and solvent used to clean dye-stained money.

Based upon his confession, Rochester's statements, and the aforementioned physical evidence discovered during the searches of his apartment and car, Dickerson was indicted by a federal grand jury on one count of conspiracy to commit bank robbery in violation of 18 U.S.C.A. § 371 (West Supp. 1998), on three counts of bank robbery in violation of 18 U.S.C.A. § 2113(a) and (d) (West Supp. 1998), and on three counts of using a firearm during and in relation to a crime of violence in violation of 18 U.S.C.A. § 924(c)(1) (West Supp. 1998).

_____

[4] Dickerson told Special Agent Lawlor and Detective Durkin that he had the handgun in question in his hand when the agents knocked on the door of his apartment.

8

On May 19, 1997, Dickerson filed a motion to suppress (1) the statements he made at the FBI Field Office; (2) the evidence found as a result of his statements; (3) the physical evidence obtained during the search of his apartment; and (4) the physical evidence obtained during the search of his car. The Government submitted a brief in opposition to the motion to suppress. Several days later, the Government supplemented its brief in opposition. A hearing on the motion to suppress was held in the United States District Court for the Eastern District of Virginia on May 30, 1997.

At the suppression hearing, the Government relied exclusively upon the testimony of Special Agent Lawlor. Among other things, Special Agent Lawlor testified that Dickerson was read (and waived) his rights under Miranda prior to his confession. Of particular importance here, Special Agent Lawlor testified that Dickerson confessed "shortly after" he obtained the warrant to search Dickerson's apartment. In contrast, Dickerson testified that he confessed prior to being read (and waiving) his Miranda rights and about thirty minutes after being informed about the warrant to search his apartment. The advice-of-rights form indicates that Dickerson waived his Miranda rights at 9:41 p.m. (J.A. at 72.) After the hearing, the district court asked the parties to submit supplemental briefs in support of their respective positions. The Government filed a supplemental memorandum on June 3, 1997.

On July 1, 1997, the district court issued an Order and Memorandum Opinion. The district court, among other things, suppressed Dickerson's statement implicating himself and Rochester in the First Virginia Bank robbery, finding that it was made while he was in police custody,[5] in response to police interrogation, and without the necessary Miranda warnings. In so holding, the district court found that Dickerson's in-court testimony was more credible than that of Special Agent Lawlor. This finding rested, in part, upon the fact that Special Agent Lawlor's testimony -- that he read Dickerson his Miranda warnings "shortly after" obtaining the warrant -- was contradicted by the warrant (issued at "8:50 p.m.") and the advice-of-

_____

[5] The Government does not challenge on appeal the district court's finding that Dickerson was in police custody for Miranda purposes when he was initially brought to the FBI Field Office.

9

rights form (executed at "9:41 p.m."). Because the documentary evidence undermined Special Agent Lawlor's credibility **6** (and supported

_____

**6** The documentary evidence, which clearly contradicted Special Agent Lawlor's testimony, was not the only reason the district court gave for finding that Special Agent Lawlor's testimony lacked credibility. First, Special Agent Lawlor testified that when he knocked on Dickerson's door he did not have his gun drawn and "didn't expect one way or the other" whether his colleagues would have their guns drawn. The district court found it "simply not credible for a well-trained Special Agent of the FBI to assert that" he did not expect his colleagues to have their weapons drawn when confronting a suspect in an armed bank robbery. (J.A. at 95 n.7.) Second, Special Agent Lawlor told Judge Kenkel that a telephonic warrant was necessary because Dickerson was not under arrest and could easily go home and destroy any evidence of the bank robbery. The district court concluded that "[i]t strains credibility to believe that the FBI would simply release" Dickerson. (J.A. at 90 n.3.) Third, Special Agent Lawlor testified that Judge Kenkel instructed him to write "evidence of the crime of bank robbery" in the section of the warrant used to identify the property to be seized. The district court found "nothing in the transcript of the telephonic application for the warrant to support" this testimony. (J.A. at 84 n.1.)

Although the district court is uniquely suited for assessing witness credibility, see United States v. Oregon State Med. Soc'y, 343 U.S. 326, 339 (1952), the aforementioned credibility determinations were, as the district court acknowledged, not based on the cadence, tone, or inflection of Special Agent Lawlor's voice. Nor, for that matter, were they based on any other factor that would be difficult to evaluate on appeal. Instead, they were based on the content of his testimony. As a result, we are as uniquely suited for assessing these particular findings as the district court.

We cannot say that Special Agent Lawlor's explanation for seeking a telephonic warrant strains credibility. Although the agents had probable cause to arrest Dickerson, there is no requirement that the police arrest a suspect the very moment that probable cause is established. Indeed, there are legitimate law enforcement reasons not to do so. See, e.g., United States v. Lovasco, 431 U.S. 783, 791 (1977) (noting that there are legitimate reasons not to arrest a suspect the moment probable cause is established); United States v. Jones, 18 F.3d 1145, 1155 (4th Cir. 1994) (recognizing that need to delay arrests even after probable cause is established). As such, we do not believe, as the district court seemingly suggests, that a telephonic warrant was improperly obtained in this case, see

Dickerson's testimony, i.e., he was read his Miranda rights about thirty minutes after being told about the warrant), the district court found that "Dickerson was not advised of his Miranda rights until after he had completed his statement to the government." (J.A. at 98.)

Although the district court suppressed the statement obtained in violation of Miranda, it nevertheless denied Dickerson's motion to suppress the evidence found as a result thereof, e.g., the statement made by Rochester identifying Dickerson as the getaway driver. The district court, relying upon this Court's decision in United States v. Elie, 111 F.3d 1135 (4th Cir. 1997), noted that evidence found as a result of a statement made in violation of Miranda may only be suppressed if the statement was involuntary within the meaning of the Due Process Clause of the Fifth Amendment. Because Dickerson's statement was voluntary under the Fifth Amendment, the district court concluded that the evidence found as a result thereof was admissible at trial.

The district court did, however, suppress the physical evidence discovered during the search of Dickerson's apartment on January 27, 1997. The district court concluded that the warrant was insufficiently particular in describing the items to be seized. Moreover, the district court concluded that the good-faith exception to the exclusionary rule was inapplicable because the agents "[e]xecuting the [w]arrant [a]cted in [b]ad [f]aith" by relying upon a warrant that was so facially deficient. (J.A. at 91.)

_____

Fed. R. Crim. P. 41(c)(2) (authorizing telephonic warrants), or that Special Agent Lawlor was untruthful when he testified that the agents did not intend to arrest Dickerson without additional evidence.

We also cannot say that "nothing" in the transcript of the telephonic application supports Special Agent Lawlor's testimony that Judge Kenkel instructed him to write "evidence of the crime of bank robbery" in the section of the warrant used to identify the property to be seized. An examination of the transcript reveals that Judge Kenkel instructed Special Agent Lawlor on what to write in virtually every section of the warrant. Although Judge Kenkel did not specifically tell Special Agent Lawlor what to write in the section in question, he did state that there was probable cause to search Dickerson's apartment for "evidence of . . . the bank robbery in question." (J.A. at 69.)

11

Finally, the district court denied Dickerson's motion to suppress the evidence discovered in the trunk of his car. The district court found that the warrant to search Dickerson's car, unlike the warrant to search his apartment, was sufficiently particular in describing the items to be seized.**7** Moreover, the district court found that the search of the car was supported by the eyewitness accounts of the bank robbery.

On July 15, 1997, the Government filed a motion asking the district court to reconsider its Order suppressing the statements made by Dickerson at the FBI Field Office and the physical evidence found during the search of Dickerson's apartment. The Government's motion included affidavits from Detective Durkin and Agent Wenko, and a statement written by Dickerson while at the FBI Field Office. In addition, the Government argued that because Dickerson's statements were voluntary, they were nonetheless admissible under the mandate of 18 U.S.C.A. § 3501 (West 1985).

Detective Durkin, who was in the interview room with Dickerson at all times, stated in his affidavit that "Dickerson was read his

_____

**7** An affidavit attached to the warrant identified the following items:

> a. A black leather backpack, and its contents;
>
> b. Currency;
>
> c. Clothing and disguises;
>
> d. Items stained by dye from explosive dye-packs;
>
> e. Firearms, ammunition, and pellet guns;
>
> f. Money or cash straps;
>
> g. Demand notes;
>
> h. Carrying bags;
>
> i. Photographs, in particular, photographs of co-conspirators;
>
> j. Address books, Rolodexes, or other documents containing names of co-conspirators; and
>
> k. Evidence of the disposition of cash obtained in bank or armed robberies.

(J.A. at 85-86.)

Miranda rights before he made th[e] statements" implicating himself and Rochester in the First Virginia Bank robbery. (J.A. at 121.) Detective Durkin explained that after Special Agent Lawlor returned to the interview room to announce that they were going to search Dickerson's apartment, Special Agent Lawlor immediately departed. According to Detective Durkin, it was not until Special Agent Lawlor returned some time later that they read Dickerson his Miranda warnings. In fact, Detective Durkin testified that when Dickerson was read his Miranda rights he still denied any involvement in the bank robbery. According to Detective Durkin, it was not until Dickerson was told that agents had found a bait bill from a bank robbery in his apartment that he decided to confess.

Attached to Detective Durkin's affidavit was a hand-written statement that Dickerson made while at the FBI Field Office in which he stated that he "was read [his] rights at 7:30 [p.m.]"**8** (J.A. at 123.) In addition, Dickerson wrote in the statement that he knew "nothing [about] the bank robbery" in question. (J.A. at 123.) Thus, according to his own hand-written note, Dickerson was read his Miranda warnings prior to implicating himself and Rochester in the First Virginia Bank robbery.**9**

_____

**8** Although 7:30 p.m. does not correspond with the time that either Detective Durkin or Special Agent Lawlor gave for when Dickerson was read his Miranda rights, Detective Durkin explained in his affidavit that when Dickerson wrote 7:30 p.m., he "specifically recall[ed] thinking that Dickerson had no idea what time it was." (J.A. at 121.) In any event, the hand-written statement does correspond with the sequence of events that is so crucial to this appeal. Specifically, the statement corroborates the agents' position that Dickerson was read his Miranda warnings prior to his confession.

**9** Dickerson's hand-written statement reads, in pertinent part, as follows:

> I was read my rights at 7:30 [b]ut I was here at 5:30. I talked to the two Detectives . . . [for] two and a half hours and then was asked to take a polygraph test. I declined because after two hours I had knowledge of the bank robbery. I told them I know nothing of the bank robbery that happened Friday. Befor[e] today I didn't have any knowle[dge] of the bank robbery.

(J.A. at 123.)

13

Finally, Agent Wenko's affidavit contradicted, among other things, the district court's finding that the agents who executed the search of Dickerson's apartment acted in bad faith. Agent Wenko, who was the lead agent during the search of Dickerson's apartment, stated that he was familiar with the specifics of the bank robbery in question and knew what specific evidence to look for. In addition, Agent Wenko stated that he had been investigating bank robberies for seven years and was very familiar with the type of evidence customarily associated with bank robberies, e.g., guns, money, bait bills, dye-stained money and clothes, disguises, carrying bags, and gloves.

On August 4, 1997, the district court denied the Government's motion for reconsideration. See United States v. Dickerson, 971 F. Supp. 1023 (E.D. Va. 1997). Noting that no provision in the Federal Rules of Criminal Procedure governed motions for reconsideration, the district court used the standard set forth in Rule 59(e) of the Federal Rules of Civil Procedure as its guide. See id. at 1024. In so doing, the district court rejected the Government's motion for reconsideration upon the ground that the Government failed to establish that "the evidence . . . was unavailable at the time of the hearing." Id. This interlocutory appeal followed.

III.

Before determining whether Congress possesses the authority to enact § 3501, we must first consider whether the district court erred in refusing to entertain the Government's motion for reconsideration.**10** (Text continued on page 16)

_____

**10** Dickerson contends that federal law does not grant the Government the right to appeal an order denying reconsideration of a suppression ruling. It is well established that the Government cannot appeal an adverse ruling in a criminal prosecution without statutory authority. See United States v. Martin Linen Supply Co., 430 U.S. 564, 568 (1977); United States v. Sanges, 144 U.S. 310, 312 (1892). Such authority, the Government maintains, is contained in 18 U.S.C.A. § 3731 (West Supp. 1998). See United States v. Scott, 437 U.S. 82, 84-85 (1978) (discussing the enactment of § 3731 to provide government appeals in criminal cases).

Section 3731 provides, in pertinent part, as follows:

> An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence.

14

. . . .

The appeal in all such cases shall be taken within thirty days after the decision, judgment or order has been rendered and shall be diligently prosecuted.

The provisions of this section shall be liberally construed to effectuate its purposes.

18 U.S.C.A. § 3731. Although § 3731 authorizes the Government to appeal orders suppressing evidence, Dickerson contends that it does not expressly authorize the Government to appeal a decision denying reconsideration of a suppression ruling. The issue, not heretofore decided by this Court, is whether § 3731, which provides that it should be liberally construed to effectuate its purposes, can be so construed as to authorize this appeal. We conclude, for the reasons that follow, that it can.

In United States v. Ibarra, 502 U.S. 1 (1991) (per curiam), the defendant was indicted for possession of cocaine with intent to distribute. See id. at 2. The district court, however, ordered that certain evidence be suppressed. See United States v. Ibarra, 725 F. Supp. 1195, 1202 (D. Wyo. 1989). The Government filed a motion for reconsideration, which was denied. See United States v. Ibarra, 731 F. Supp. 1037, 1041 (D. Wyo. 1990). On appeal, the Tenth Circuit dismissed the Government's appeal as untimely. See United States v. Ibarra, 920 F.2d 702, 707 (10th Cir. 1990) (holding that appeal must be filed within thirty days of a district court's suppression ruling). On petition for certiorari, the Supreme Court held that the thirty-day period in which the Government was required to file its appeal under § 3731 began to run on the date that the district court denied the Government's motion for reconsideration, not on the date of the district court's original suppression order. See Ibarra, 502 U.S. at 6-7. In so holding, the Supreme Court necessarily concluded that § 3731 authorizes the Government to appeal a decision denying reconsideration of a suppression ruling.

Our conclusion that we have jurisdiction to hear this appeal is also buttressed by the knowledge that, in enacting § 3731, "Congress intended to remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit." United States v. Wilson, 420 U.S. 332, 337 (1975); see also Arizona v. Manypenny, 451 U.S. 232, 247 & n.24, 249 (1981) (noting that Government appeals are permitted to the extent that they are not prohibited by the Constitution). Dickerson does

15

Although a case of first impression in this Court, our sister circuits review a district court's refusal to reopen a suppression hearing for abuse of discretion. See, e.g., United States v. Hassan, 83 F.3d 693, 696 (5th Cir. 1996); United States v. Roberts , 978 F.2d 17, 20 (1st Cir. 1992); United States v. Buffington, 815 F.2d 1292, 1298 (9th Cir. 1987). We adopt that standard here.

Under an abuse of discretion standard, a reviewing court may not substitute its judgment for that of the district court. See, e.g., United States v. Mason, 52 F.3d 1286, 1289 (4th Cir. 1995). Indeed, an appeals court may uphold the exercise of a district court's discretion even where it might have ruled differently on the matter in the first instance. Instead, our task is simply to determine whether the district court's exercise of discretion was arbitrary or capricious in light of the governing law and the facts. See, e.g., id.

In its motion for reconsideration, the U.S. Attorney's Office asked the district court to reverse its suppression rulings on two grounds. First, the Government presented the district court with additional evidence that corroborated Special Agent Lawlor's testimony concerning when Dickerson was read his Miranda warnings. Second, the Government argued that even if Dickerson's confession was elicited in technical violation of Miranda, it was nevertheless admissible under 18 U.S.C.A. § 3501 (West 1985). We address each ground in turn.

A.

Relying upon Rule 59(e) of the Federal Rules of Civil Procedure, the district court rejected the Government's motion for reconsidera-

_____

not contend that the instant appeal is constitutionally prohibited. Thus, Dickerson's suggestion that we lack jurisdiction to hear this appeal is without merit. Accord United States v. Hassan , 83 F.3d 693, 697 (5th Cir. 1996) (holding that "'an appeal from a denial of a motion to reconsider necessarily raises the underlying [suppression] judgment for review'" (quoting United States v. Herrold , 962 F.2d 1131, 1136 (3d Cir. 1992))); United States v. Roberts, 978 F.2d 17, 18 (1st Cir. 1992) (entertaining Government's appeal from the denial of a motion to reconsider a suppression ruling).

16

tion because the Government failed to establish that"the evidence . . . was unavailable at the time of the hearing." United States v. Dickerson, 971 F. Supp. 1023, 1024 (E.D. Va. 1997). The Government actually conceded, as it does on appeal, that the evidence forming the basis for its motion was available at the time of the suppression hearing. The Government explains, however, that the evidence was not introduced because (1) it never believed that the district court would find Dickerson more believable than Special Agent Lawlor; and (2) it did not want to burden the district court with cumulative evidence.

As an initial matter, although Rule 59(e) of the Federal Rules of Civil Procedure requires a showing that the evidence supporting a motion for reconsideration was not available at the time of the initial hearing, see Hutchinson v. Staton, 994 F.2d 1076, 1081 (4th Cir. 1993), the Federal Rules of Civil Procedure are not binding in criminal proceedings. As a result, that evidence was available to the movant prior to the suppression hearing does not, as a matter of law, defeat a motion for reconsideration in a criminal case. See, e.g., United States v. Regilio, 669 F.2d 1169, 1177 (7th Cir. 1981) (recognizing that "society's interest in admitting all relevant evidence militates strongly in favor of permitting reconsideration").

We also recognize, however, that the district court has a strong interest in controlling its docket and avoiding piecemeal litigation. Thus, when the evidence forming the basis for a party's motion for reconsideration was in the movant's possession at the time of the initial hearing, as was the case here, the movant must provide a legitimate reason for failing to introduce that evidence prior to the district court's ruling on the motion to suppress before we will determine that a district court abused its discretion in refusing to reconsider its suppression ruling.[11]

_____

[11] We note that granting a new trial on the basis of evidence available at the time of the trial is strictly prohibited. See, e.g., United States v. Bales, 813 F.2d 1289, 1295 (4th Cir. 1987) (noting that under Fed. R. Crim. P. 33 "the evidence must be, in fact, newly discovered, i.e., discovered since the trial"); United States v. Singh, 54 F.3d 1182, 1190 (4th Cir. 1995) (same). Of course, Rule 33 of the Federal Rules of Criminal Procedure, which governs new trial motions, does not apply to motions for reconsideration of evidentiary rulings prior to trial. As such, granting a motion for reconsideration on the basis of evidence available to the movant at the time of the suppression hearing is not strictly prohibited.

17

Before considering the Government's reasons for failing to introduce the evidence in question, however, we note that it was given numerous opportunities to introduce the evidence prior to the district court's ruling on the suppression motion. Dickerson's motion to suppress was filed on May 19, 1997. On May 23, 1997, the Government filed a response to Dickerson's motion to suppress. Four days later, the Government supplemented its response. A hearing on the motion was held on May 30, 1997. Finally, at the district court's request, the Government was given yet another opportunity to file an additional supplemental memorandum in support of its position on June 3, 1997. At none of these junctures did the Government introduce the two affidavits and the statement.

In light of the ample opportunities the Government had to introduce the evidence in question prior to the district court's ruling on the motion to suppress, its articulated reasons for failing to do so ring hollow. First, the Government contends that it never believed that the district court would find Dickerson more credible than Special Agent Lawlor. Even if this explanation was tenable prior to the suppression hearing, Special Agent Lawlor's testimony on the primary issue in dispute, i.e., whether Dickerson was read his Miranda warnings prior to his confession, was completely undermined by the Government's own documentary evidence, which supported Dickerson's version of events. After the hearing, therefore, the Government should have been firmly disabused of any misconceptions concerning whom the district court would find more credible. Because the Government was given the opportunity to file a supplemental memorandum after the hearing, the Government's failure to introduce the affidavits of Detective Durkin and Agent Wenko and the statement written by Dickerson cannot be explained by its first justification.

Next, the Government contends that it did not want to burden the district court with cumulative evidence. What the Government means by cumulative evidence is not entirely clear. Because every additional piece of evidence offered is, by definition, cumulative, cumulative evidence is not bad per se. Indeed, under the Federal Rules of Evidence it is the "needless presentation of cumulative evidence" that is to be avoided.**12** Fed. R. Evid. 403. With that understanding, the Gov-

_____

**12** We do not mean to imply that the Federal Rules of Evidence are binding at a suppression hearing; they are not. See Fed. R. Evid. 104(a)

18

ernment's argument necessarily assumes that Special Agent Lawlor's testimony should have been sufficient and that any additional evidence would, in fact, be needlessly cumulative. For the reasons stated above, however, the Government should have known after the hearing that additional evidence was not needlessly cumulative, but absolutely necessary.**13**

In any event, why the Government would consider the statement written by Dickerson -- in which he admits that he was read his Miranda warnings prior to implicating himself in a series of bank robberies -- to be needlessly cumulative on the pivotal question of whether he was read his Miranda warnings prior to implicating himself in a series of bank robberies is difficult to understand. Evidence that is so probative that it would likely change the mind of the factfinder is not needlessly cumulative. Cf. 22 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5220, at 306 (1978) (noting similar principle under Rule 403).

_____

(providing that the rules of evidence are not binding at a preliminary proceeding). We refer to Rule 403 only because it casts some light on the phrase "cumulative evidence."

**13** In its motion for reconsideration, the Government confessed that "this [was] one of those deals where they[throw] the case at [the Assistant United States Attorney] at 4:00 on the day before [the hearing]." United States v. Dickerson, 971 F. Supp. 1023, 1025 n.2 (E.D. Va. 1997) (final alteration in original). Similarly, during the hearing on the motion to reconsider the Government acknowledged "that the Assistant United States Attorney had very little time to prepare[Special] Agent Lawlor." Id. at 1024. Had the Government simply compared Special Agent Lawlor's recollection of events against its documentary evidence prior to the suppression hearing, it would have discovered the need to introduce additional evidence.

While we respect the Government's candidness on this point, it raises further questions relating to the proffered reasons for failing to present the additional affidavits and statement earlier. For example, if the Government failed to prepare and present its case properly, we wonder how it could have known that additional evidence would be needlessly cumulative.

19

In sum, because the district court gave the Government the opportunity to introduce the affidavits of Detective Durkin and Agent Wenko and Dickerson's hand-written statement after the suppression hearing, we conclude that the Government's failure to do so cannot adequately be explained by its proffered reasons. Accordingly, we cannot say that the district court abused its discretion in denying the Government's motion for reconsideration based upon its refusal to consider evidence that was in the Government's possession at the time of the initial hearing.

B.

Because "[a] district court by definition abuses its discretion when it makes an error of law," Koon v. United States, 116 S. Ct. 2035, 2047 (1996), we must address the Government's second proffered ground for reconsideration of the suppression ruling, namely whether § 3501, rather than Miranda, governs the admissibility of Dickerson's confession.

1.

Whether § 3501 or Miranda governs the admissibility of Dickerson's confession ultimately turns on the answers to two questions. Does § 3501 purport to supersede the rule set forth by the Supreme Court in Miranda? If it does, does Congress possess the authority legislatively to overrule Miranda? Prior to addressing these questions, however, we feel compelled to respond to the dissent's assertion that the question of § 3501's applicability is not properly before us.

Although raised by the Government in its motion for reconsideration, the applicability of § 3501 was not briefed by the Government on appeal.[14] We note, however, that this was no simple oversight. The

_____

[14] Pursuant to Local Rule 27(c), the clerk's office granted the unopposed motion of the Washington Legal Foundation and the Safe Streets Coalition (amici) to file a brief in this case. In light of the Government's unwillingness to defend the constitutionality of § 3501, amici also sought leave to share five minutes of the Government's allotted oral argument time. Under the Federal Rules of Appellate Procedure, "[a] motion of an

20

United States Department of Justice took the unusual step of actually prohibiting the U.S. Attorney's Office from briefing the issue. To be sure, this was not an isolated incident. Over the last several years, the Department of Justice has not only failed to invoke § 3501, it has affirmatively impeded its enforcement.

For example, in <u>Davis v. United States</u>, 512 U.S. 452 (1994), which involved the defendant's attempt to suppress an incriminating state-

_____

amicus curiae to participate in oral argument will be granted only for extraordinary reasons." Fed. R. App. P. 29. Because the Department of Justice's refusal to defend the constitutionality of an Act of Congress is an extraordinary event, we granted amici's motion to share oral argument time with the Government. Indeed, federal courts have frequently appointed amici to participate in oral argument where neither side will defend an important position. <u>See, e.g.</u>, <u>Bousley v. United States</u>, 118 S. Ct. 1604, 1609 (1998) (inviting private party to file an amicus brief and to participate in oral argument when Government declined to defend ruling in its favor); <u>Bob Jones Univ. v. United States</u>, 461 U.S. 574, 585 n.9, 599 n.24 (1983) (same); <u>McKinney v. Indiana Michigan Power Co.</u>, 113 F.3d 770, 772 n.2 (7th Cir. 1996) (appointing amicus "so that [the court] might have the benefit of an adversary presentation of the issues raised by the appeal"); <u>United States v. Chagra</u>, 701 F.2d 354, 366 (5th Cir. 1983) (appointing amicus "to ensure that this appeal continues to be presented in an adversary context").

Amici urged this Court, both in its brief and during oral argument, to consider the admissibility of Dickerson's confession under the mandate of § 3501. Although we had the benefit of amici's briefing, the dissent criticizes our application of § 3501 "without the benefit of any briefing in opposition." <u>Post</u> at 47. Although we would have preferred to have had such briefing, the Department of Justice, as we note in greater detail above, actually prohibited the U.S. Attorney's Office from briefing § 3501 in this case. <u>Cf.</u> Letter from John C. Keeney, Acting Assistant Attorney General, to all United States Attorneys and all Criminal Division Section Chiefs (Nov. 6, 1997) (forbidding "federal prosecutors [from] rely[ing] on the voluntariness provision of Section 3501"). Moreover, when pressed at oral argument, counsel for the United States informed the Court that he had been prohibited by his superiors at the Department of Justice from discussing § 3501. Because it is our duty to apply the governing law to every case or controversy before us, it was unfortunately necessary to proceed without any briefing from the Department of Justice.

21

ment made after an ambiguous request for counsel, the Department of Justice expressly declined to take a position on the applicability of § 3501. See id. at 457 n.*. As a result, the majority opinion declined to consider the issue. See id. (declining to reach issue because "we are reluctant to do so when the issue is one of first impression involving the interpretation of a federal statute on which the Department of Justice expressly declines to take a position"). Justice Scalia, in a concurring opinion, chided the Department of Justice for its failure to invoke § 3501:

> The United States' repeated refusal to invoke § 3501, combined with the courts' traditional (albeit merely prudential) refusal to consider arguments not raised, has caused the federal judiciary to confront a host of "Miranda" issues that might be entirely irrelevant under federal law. Worse still, it may have produced -- during an era of intense national concern about the problem of run-away crime -- the acquittal and the nonprosecution of many dangerous felons, enabling them to continue their depredations upon our citizens. There is no excuse for this.

Id. at 465 (citations omitted). Justice Scalia further questioned whether the Department of Justice's failure to invoke § 3501 was "consistent with the Executive's obligation to `take Care that the Laws be faithfully executed.'" Id. (quoting U.S. Const. Art. II, § 3).

Over the past few years, career federal prosecutors have tried to invoke § 3501 in this Court only to be overruled by the Department of Justice.**15** In March of 1997, for example, the U.S. Attorney's

_____

**15** Justice's refusal to invoke § 3501 has not been limited to this Circuit. In Cheely v. United States, 21 F.3d 914 (9th Cir. 1994), the Ninth Circuit suppressed an incriminating statement that was obtained in technical violation of Edwards. Id. at 923. Although the Government did not petition for rehearing, the Ninth Circuit sua sponte asked the parties whether the case merited rehearing en banc. See Cheely v. United States, 92-30257 (9th Cir. May 25, 1994) (unpublished order). Curiously, Justice filed a memorandum opposing further review. One week later, the Supreme Court in Davis v. United States, 512 U.S. 452 (1994), would bring § 3501 to the attention of the legal community. In response, a career fed-

22

Office in Alexandria, Virginia, appealed the suppression of a statement that the district court found was obtained in technical violation of <u>Miranda</u>. <u>See United States v. Sullivan</u>, 138 F.3d 126 (4th Cir. 1998). In its brief, the U.S. Attorney's Office urged this Court to reverse the district court on the basis of § 3501. The Department of Justice, however, ordered the U.S. Attorney's Office to withdraw its brief. In its place, a brief without any reference to § 3501 was filed. As a result, the Washington Legal Foundation and United States Senators Jeff Sessions, Jon Kyl, John Ashcroft, and Strom Thurmond filed an amicus brief urging this Court to consider the admissibility of Sullivan's confession under § 3501. Because we ultimately concluded that Sullivan was not in custody for <u>Miranda</u> purposes when the incriminating statements were made, we had no occasion to address the applicability of § 3501. <u>See id.</u> at 134 n.*.

In June of 1997, this Court issued an opinion upholding the suppression of a confession obtained in technical violation of <u>Miranda</u>. <u>See United States v. Leong</u>, 116 F.3d 1474 (4th Cir. 1997) (unpublished). Although the United States did not seek rehearing, the Washington Legal Foundation and the Safe Streets Coalition moved this Court for leave to proceed as amici curiae. In their motion, the putative amici took the Government to task for failing to assert the applicability of § 3501. As a result, we ordered the Department of Justice to address the effect of § 3501 on the admissibility of Leong's confession. In response, Attorney General Janet Reno, although purporting to follow the advice of her career prosecutors in other matters, notified Congress that the Department of Justice would not defend the

_____

eral prosecutor sent a letter to the Ninth Circuit apprising them of the Court's decision in <u>Davis</u>. Later that same day, Solicitor General Drew Days withdrew the earlier letter and replaced it with a letter that downplayed the relevance of <u>Davis</u> to the issues at hand. Notwithstanding the letter from the Solicitor General, the Ninth Circuit "called for supplemental briefing from the parties as to the effect <u>Davis</u> might have on our conclusion" to suppress the statements in question. <u>Cheely v. United States</u>, 36 F.3d 1439, 1448 (9th Cir. 1994). Although Justice filed a supplemental brief, it nevertheless failed to even argue the applicability of § 3501. Upon reconsideration, the Ninth Circuit still suppressed the statement. <u>See id.</u>

23

constitutionality of § 3501, see 2 U.S.C.A. § 288k(b) (West 1997) (requiring the Department of Justice to notify the United States Congress whenever it will not defend the constitutionality of a federal statute), and filed with this Court a brief to the same effect.**16**

Against this background, the Government's failure to raise the applicability of § 3501 on appeal in this case does not come as a surprise. Of even greater importance, neither does it prevent us from considering the applicability of § 3501 on appeal. Even where the parties abdicate their responsibility to call relevant authority to this Court's attention, cf. Va. Code Prof. Resp. 7-20, they cannot prevent us from deciding the case under the governing law simply by refusing to argue it, see United States Nat'l Bank of Or. v. Independent Ins. Agents of America, Inc., 508 U.S. 439, 445-48 (1993).**17** Indeed, it is now well established that "the proper administration of the criminal law cannot be left merely to the stipulation of parties." Young v. United States, 315 U.S. 257, 259 (1942).

_____

**16** The Department of Justice has taken the position that unless the Supreme Court overrules Miranda, "the United States is not free to urge the lower courts" to "rely on Section 3501." See Letter from John C. Keeney, Acting Assistant Attorney General, to all United States Attorneys and all Criminal Division Section Chiefs (Nov. 6, 1997) (noting that "[t]he Department has not yet decided whether it would ask the Supreme Court in an appropriate case to overrule or modify Miranda").

**17** The dissent argues, and we do not dispute, that "the only issues not raised by the parties that we are required to consider are those of subject matter jurisdiction and justiciability." Post at 48 (emphasis added). That observation, however, is of no real import. First, as we note above, this Court may, in its discretion, consider issues not raised below. See post at 25-26. Second, and more importantly, we are not considering an issue that was not raised by the parties. The issue on appeal is the district court's suppression ruling. Without question, we are free to address ourselves to any legal theory that would bear on the issue under appeal. See Shafer v. Preston Memorial Hosp. Corp., 107 F.3d 274, 275 n.1 (4th Cir. 1997) ("We have consistently recognized that we may [decide a case] on different grounds than those employed by the district court."); Jackson v. Kimel, 992 F.2d 1318, 1322 (4th Cir. 1993) (same). Thus, because the Government has appealed the district court's suppression ruling, we are free to consider the applicability of § 3501.

24

The dissent contends that "we are faced with essentially the same situation that the Supreme Court confronted in <u>Davis</u> when it refused to take up § 3501." <u>Post</u> at 49. We disagree. Although the Supreme Court declined <u>sua sponte</u> to consider the applicability of § 3501 in <u>Davis</u>, 512 U.S. at 457 n.*, that decision was influenced by prudential concerns not present here, <u>id.</u> at 465 (Scalia, J., concurring) (noting that the Court's decision not to consider the applicability of § 3501 was influenced by prudential concerns, rather than by statutory constraints on the Supreme Court's jurisdiction). As a general matter, "a court should avoid deciding a constitutional question when it can dispose of a case on another basis." <u>Jimenez v. BP Oil, Inc.</u>, 853 F.2d 268, 270 (4th Cir. 1988) (citing <u>Ashwander v. Tennessee Valley Auth.</u>, 297 U.S. 288, 346 (1936) (Brandeis, J., concurring)). Having determined that the defendant's ambiguous reference to an attorney during a custodial interrogation was not a request for counsel for purposes of <u>Edwards v. Arizona</u>, 451 U.S. 477, 484-85 (1981), <u>see Davis</u>, 512 U.S. at 459, the Court had no reason to consider whether the defendant's confession was also admissible under the mandate of § 3501, especially because the Department of Justice had expressly declined to take a position on the provision's constitutionality, <u>see id.</u> at 457 n.*. Dickerson's confession, in contrast, was obtained in violation of <u>Miranda</u>. Thus, unlike the situation in <u>Davis</u>, we cannot avoid deciding the constitutional question associated with§ 3501. Moreover, and again unlike the situation in <u>Davis</u>, the Department of Justice has now taken the position that § 3501 is unconstitutional. <u>See</u> Letter from Janet Reno, Attorney General, to Congress (Sept. 10, 1997) (notifying Congress that the Department of Justice will not defend the constitutionality of the statute). As a result, the specific prudential concerns that animated the Supreme Court's decision not to consider the applicability of § 3501 in <u>Davis</u> are simply not present here.

Furthermore, the primary reason for the Supreme Court's general reluctance to consider arguments not raised is not applicable to inferior federal courts such as this one. The Supreme Court "sits as a court of review." <u>Duignan v. United States</u>, 274 U.S. 195, 200 (1927). Thus, it generally will not consider issues "not pressed or passed upon below." <u>Id.</u>; <u>see also Pennsylvania Dep't of Corrections v. Yeskey</u>, 118 S. Ct. 1952, 1956 (1998) (declining to address issue that was not presented to either the District Court or the Court of Appeals); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 147 n.2 (1970) ("Where

25

issues are neither raised before nor considered by the Court of Appeals, this Court will not ordinarily consider them."). In contrast, "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." Singleton v. Wulff, 428 U.S. 106, 121 (1976); see also United States Nat'l Bank of Or., 508 U.S. at 445-48 (stating that it was proper for the Court of Appeals to consider whether the controlling statute had been repealed despite the parties' failure to raise the issue).

Because the Department of Justice will not defend the constitutionality of § 3501 -- and no criminal defendant will press the issue -- the question of whether that statute, rather than Miranda, governs the admission of confessions in federal court will most likely not be answered until a Court of Appeals exercises its discretion to consider the issue. Here, the district court has suppressed a confession that, on its face, is admissible under the mandate of § 3501, i.e., the confession was voluntary under the Due Process Clause, but obtained in technical violation of Miranda. As a result, we are required to consider the issue now. Cf. Davis, 512 U.S. at 464 (Scalia, J., concurring) (noting that the "time will have arrived" to consider the applicability of § 3501 the next time "a case that comes within the terms of th[e] statute is . . . presented to us"); see also Eric D. Miller, comment, Should Courts Consider 18 U.S.C. § 3501 Sua Sponte?, 65 U. Chi. L. Rev. 1029 (1998) (answering question in the affirmative).

a.

Having determined that the issue is properly before the panel, we must first determine whether § 3501 purports to supersede the rule set forth by the Supreme Court in Miranda. To do so, a brief history of the rules governing the admissibility of confessions before and after Miranda is in order. See generally Development in the Law -- Confessions, 79 Harv. L. Rev. 935 (1966) [hereinafter Developments].

"At early common law, confessions were admissible at trial without restrictions." Id. at 954; see also McCormick's Handbook on the Law of Evidence § 147, at 313 (1972) (Edward W. Cleary, ed., West 2d ed. 1972) (citing 3 Wigmore, Evidence § 818 (3d ed. 1940)). In the latter part of the eighteenth century, however, courts began to recognize

26

that certain confessions were not trustworthy. See, e.g., The King v. Rudd, 168 Eng. Rep. 160 (K.B. 1783) (holding that "no credit ought to be given" to "a confession forced from the mind by the flattery of hope, or by the torture of fear"). Although several tests were developed to determine whether a confession was trustworthy, a confession was generally thought to be reliable only if made voluntarily. See, e.g., Regina v. Garner, 169 Eng. Rep. 267 (Ct. Crim. App. 1848); Regina v. Baldry, 169 Eng. Rep. 568 (Ct. Crim. App. 1852).

In Hopt v. Utah, 110 U.S. 574 (1884), the Supreme Court specifically adopted the common law rule that a confession was reliable, and therefore admissible, if it was made voluntarily. Id. at 584-85 (holding that a confession was voluntary if not induced by threat or promise) (citing Regina v. Baldry, 169 Eng. Rep. 568 (Ct. Crim. App. 1852)); see also Pierce v. United States, 160 U.S. 355, 357 (1896) (same). In subsequent cases, the Supreme Court applied the common law test of voluntariness to confessions. See Developments, supra, at 959. In so doing, the Court rejected the argument that a confession was involuntary simply because the suspect was in custody. See Sparf v. United States, 156 U.S. 51, 55 (1895). Similarly, in Wilson v. United States, 162 U.S. 613 (1896), the Supreme Court specifically held that the failure to warn a suspect of his right to remain silent and of his right to counsel did not render a confession involuntary. Id. at 624.

In Bram v. United States, 168 U.S. 532 (1897), the Supreme Court asserted, for the first time, a constitutional basis for its requirement that a confession be made voluntarily. Id. at 542 (stating that whether a confession is voluntary "is controlled by that portion of the fifth amendment . . . commanding that no person `shall be compelled in any criminal case to be a witness against himself'" (quoting U.S. Const. amend. V.)). According to the Court, the Fifth Amendment privilege against self-incrimination "was but a crystallization" of the common law rule that only voluntary confessions are admissible as evidence. Id. Although the Supreme Court-- prior to Miranda -- would eventually place less reliance upon the approach taken in Bram, see, e.g., United States v. Carignan, 342 U.S. 36, 41 (1951) (expressing doubt about "[w]hether involuntary confessions are excluded from federal criminal trials on the ground of a violation of the Fifth Amendment's protection against self-incrimination, or from

27

a rule that forced confessions are untrustworthy" (footnote omitted)), the Supreme Court in <u>Brown v. Mississippi</u>, 297 U.S. 278 (1936), invoked another constitutional basis for its requirement that a confession be made voluntarily: the Due Process Clause. <u>Id.</u> at 285-86. Thereafter, a confession was admissible only if voluntary within the meaning of the Due Process Clause. <u>See, e.g.</u>, <u>Haynes v. Washington</u>, 373 U.S. 503 (1963); <u>Ashcraft v. Tennessee</u>, 322 U.S. 143, 154 (1944); <u>Chambers v. Florida</u>, 309 U.S. 227 (1940).

Thus, prior to <u>Miranda</u>, the rule governing the admissibility of confessions in federal court -- if not the rule's justification -- remained the same for nearly 180 years: confessions were admissible at trial if made voluntarily. <u>See, e.g.</u>, <u>Davis v. United States</u>, 512 U.S. 452, 464 (1994) (Scalia, J., concurring) (noting that prior to <u>Miranda</u>, "voluntariness <u>vel non</u> was the touchstone of admissibility of confessions"); <u>Miranda v. Arizona</u>, 384 U.S. 436, 506-07 (1966) (Harlan, J., dissenting) (noting that voluntariness has been the test for admitting confessions since the earliest days of the Republic). Indeed, in <u>Lisenba v. California</u>, 314 U.S. 219 (1941), the Supreme Court specifically referred to "voluntariness" as the federal test for determining the admissibility of confessions. <u>Id.</u> at 236.

Such was the stage in 1966 when the Supreme Court decided <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). In <u>Miranda</u>, the Supreme Court announced a new analytical approach to the admissibility of confessions. Specifically, the Court rejected a case-by-case determination of whether a confession was voluntary. Instead, the Court held that any statement stemming from the custodial interrogation of a suspect would be presumed involuntary, and therefore inadmissible, unless the police first provided the suspect with four warnings.**18** Although the Court relied upon its prior decision in <u>Bram v. United States</u>, 168 U.S. 532 (1897) (holding that voluntariness is required by the Fifth Amendment), for support, <u>Miranda</u>, 384 U.S. at 461-62, the Court acknowledged that the Constitution requires no"particular

_____

**18** The four warnings are: (1) that the suspect has the right to remain silent; (2) that any statements he makes can be used against him; (3) that he has the right to the presence of an attorney during questioning; and (4) that an attorney will be appointed for him if he cannot afford one. <u>See</u> <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).

28

solution for the inherent compulsions of the interrogation process," id. at 467, and left open the opportunity for the States and Congress to "develop their own safeguards for the privilege, so long as they are fully as effective as [the four warnings] in informing accused persons of their right of silence and in affording a continuous opportunity to exercise it," id. at 490. The Court held that until that time, the warning "safeguards must be observed." Id. at 467.

Congress enacted § 3501 just two years after the Supreme Court decided Miranda. When interpreting an act of Congress, "our inquiry begins with an examination of the language used in the statute." Faircloth v. Lundy Packing Co., 91 F.3d 648, 653 (4th Cir. 1996) (citing Stiltner v. Beretta U.S.A. Corp., 74 F.3d 1473, 1482 (4th Cir.), cert. denied, 117 S. Ct. 54 (1996)), cert. denied, 117 S. Ct. 738 (1997). Section 3501 provides as follows:

> (a) In any criminal prosecution brought by the United States or by the District of Columbia, a confession, as defined in subsection (e) hereof, shall be admissible in evidence if it is voluntarily given. Before such confession is received in evidence, the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness. If the trial judge determines that the confession was voluntarily made it shall be admitted in evidence and the trial judge shall permit the jury to hear relevant evidence on the issue of voluntariness and shall instruct the jury to give such weight to the confession as the jury feels it deserves under all the circumstances.

> (b) The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defen-

29

dant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

(c) In any criminal prosecution by the United States or by the District of Columbia, a confession made or given by a person who is a defendant therein, while such person was under arrest or other detention in the custody of any law-enforcement officer or law-enforcement agency, shall not be inadmissible solely because of delay in bringing such person before a magistrate or other officer empowered to commit persons charged with offenses against the laws of the United States or of the District of Columbia if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest or other detention: Provided, That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate or other officer beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate or other officer.

(d) Nothing contained in this section shall bar the admission in evidence of any confession made or given voluntarily by any person to any other person without interrogation by anyone, or at any time at which the person who made or gave such confession was not under arrest or other detention.

(e) As used in this section, the term "confession" means any confession of guilt of any criminal offense or any self-incriminating statement made or given orally or in writing.

30

18 U.S.C.A. § 3501. The above-quoted statutory language is plain. Congress has provided that "a confession . . . shall be admissible in evidence if it is voluntarily given." 18 U.S.C.A.§ 3501(a). Based upon the statutory language, it is perfectly clear that Congress enacted § 3501 with the express purpose of legislatively overruling Miranda and restoring voluntariness as the test for admitting confessions in federal court. See, e.g., Stephen A. Saltzburg & Daniel J. Capra, American Criminal Procedure 545 (5th ed. 1996) (noting that "the intent of Congress was to `overrule' Miranda in favor of a return to the `voluntariness' standard").

That Congress wished to return to a case-by-case determination of whether a confession was voluntarily given is undeniable. See S. Rep. No. 90-1097 (1968), reprinted in 1968 U.S.C.C.A.N. 2112. Although certainly not dispositive, it is worth noting that the Senate Report accompanying § 3501 specifically stated that"[t]he intent of the bill is to reverse the holding of Miranda v. Arizona , 384 U.S. 436 (1966)." Id. at 2141. Indeed, although acknowledging that"[t]he bill would also set aside the holdings of such cases as McNabb v. United States, 318 U.S. 332 (1943), and Mallory v. United States, 354 U.S. 449 (1957)," id., the Report stated that Miranda "is the case to which the bill is directly addressed," id. Senate opponents likewise recognized that § 3501, by making voluntariness the sole criterion for the admissibility of confessions, was meant to repeal the irrebuttable presumption created by Miranda. See id. at 2210-11 (noting that § 3501 was "squarely in conflict with the Supreme Court's decision in Miranda v. Arizona").

Similarly, both proponents and opponents of § 3501 in the House of Representatives noted that the statute was meant to overrule the irrebuttable presumption created by Miranda. See, e.g., 114 Cong. Rec. 16,066 (1968) (statement of Rep. Celler); id. at 16,074 (statement of Rep. Corman); id. at 16,278 (statement of Rep. Poff); id. at 16,279 (statement of Rep. Taylor); id. at 16,296 (statement of Rep. Randall); id. at 16,297-98 (statement of Rep. Pollock).

Although Congress enacted § 3501 with the express purpose of restoring voluntariness as the test for admitting confessions in federal court, it is important to note that Congress did not completely abandon the central holding of Miranda, i.e. , the four warnings are impor-

31

tant safeguards in protecting the Fifth Amendment privilege against self-incrimination. Indeed, § 3501 specifically lists the <u>Miranda</u> warnings as factors that a district court should consider when determining whether a confession was voluntarily given. <u>See</u> 18 U.S.C.A. § 3501(b). Congress simply provided that the failure to administer the warnings to a suspect would no longer create an irrebuttable presumption that a subsequent confession was involuntarily given. <u>See id.</u> (providing that the <u>Miranda</u> warnings are not dispositive on the issue of voluntariness).

b.

Based on the statutory language alone, it is clear that Congress enacted § 3501 with the express purpose of returning to the pre-<u>Miranda</u> case-by-case determination of whether a confession was voluntary. We now turn to our next inquiry: Does Congress possess the authority to supersede the irrebuttable presumption created in <u>Miranda</u> that any unwarned statement to the police is involuntary, and therefore inadmissible?

Interestingly, much of the scholarly literature on <u>Miranda</u> deals not with whether Congress has the legislative authority to overrule the presumption created in <u>Miranda</u>, but whether it should. <u>Miranda</u>'s opponents, like Professor Paul Cassell, contend that thousands of violent criminals escape justice each year as a direct result of <u>Miranda</u>. <u>See, e.g.</u>, Paul G. Cassell & Richard Fowles, <u>Handcuffing the Cops? A Thirty-Year Perspective on Miranda's Harmful Effects on Law Enforcement</u>, 50 Stan. L. Rev. 1055 (1998); Paul G. Cassell, <u>All Benefits, No Costs: The Grand Illusion of Miranda's Defenders</u>, 90 Nw. U. L. Rev. 1084 (1996); Paul G. Cassell, <u>Miranda's Social Costs: An Empirical Reassessment</u>, 90 Nw. U. L. Rev. 387 (1996). In contrast, its proponents, like Professor Stephen Schulhofer, argue that <u>Miranda</u> has had little impact on law enforcement's ability to obtain confessions. <u>See, e.g.</u>, Stephen J. Schulhofer, <u>Miranda's Practical Effect: Substantial Benefits and Vanishingly Small Social Costs</u>, 90 Nw. U. L. Rev. 500 (1996); Stephen J. Schulhofer, <u>Reconsidering Miranda</u>, 54 U. Chi. L. Rev. 435 (1987). This debate, however, is one we need not enter. Whether Congress should overrule <u>Miranda</u> tells us nothing about whether it could. More importantly, it is not our role to answer that question. It is the province of the judiciary to determine what the

32

law is, not what it should be. See Marbury v. Madison, 5 U.S. (1 Cranch) 137 (1803).

In City of Boerne v. Flores, 117 S. Ct. 2157 (1997), the Court recently held that Congress does not possess the legislative authority to supersede a Supreme Court decision construing the Constitution. See id. at 2172 (refusing to enforce federal statute establishing more narrow test for violation of the Free Exercise Clause than prior test established by Supreme Court). On the other hand, Congress possesses the legislative authority to overrule judicially created rules of evidence and procedure that are not required by the Constitution. See Palermo v. United States, 360 U.S. 343, 345-48 (1959) (upholding federal statute establishing more narrow disclosure of Jenks material than prior rule established by Supreme Court); see also Carlisle v. United States, 517 U.S. 416, 426 (1996) (noting that the federal courts may formulate rules of evidence and procedure so long as they do not conflict with an Act of Congress); Vance v. Terrazas, 444 U.S. 252, 265 (1980) (upholding statute altering the evidentiary standard for expatriation proceedings established by the Supreme Court because prior standard created by the Court was not required by "the Constitution"). In fact, the power of the Supreme Court to prescribe nonconstitutional "rules of procedure and evidence for the federal courts exists only in the absence of a relevant Act of Congress." Palermo, 360 U.S. at 353 n.11 (citing Funk v. United States, 290 U.S. 371, 382 (1933), and Gordon v. United States, 344 U.S. 414, 418 (1953)).

Whether Congress has the authority to enact § 3501, therefore, turns on whether the rule set forth by the Supreme Court in Miranda is required by the Constitution. If it is, Congress lacked the authority to enact § 3501, and Miranda continues to control the admissibility of confessions in federal court. See City of Boerne, 117 S. Ct. at 2172. If it is not required by the Constitution, then Congress possesses the authority to supersede Miranda legislatively, and § 3501 controls the admissibility of confessions in federal court. See Palermo, 360 U.S. at 353 n.11.

Using the same analysis, several federal courts have found that § 3501 superseded the rule set forth in McNabb v. United States, 318 U.S. 332 (1943), and Mallory v. United States , 354 U.S. 449 (1957). See United States v. Pugh, 25 F.3d 669, 675 (8th Cir. 1994) (holding

33

that § 3501 superseded the McNabb/Mallory rule); United States v. Christopher, 956 F.2d 536, 538-39 (6th Cir. 1991) (noting that § 3501, rather than McNabb/Mallory, governs the admissibility of confessions in federal court). In particular, the Eighth and Sixth Circuits first ascertained whether the rule set forth by the Supreme Court in McNabb and Mallory was required by the Constitution. See Pugh, 25 F.3d at 675; Christopher, 956 F.2d at 538-39. In McNabb, the Supreme Court exercised its supervisory power over the federal courts to exclude all incriminating statements, including voluntary confessions, obtained during an unreasonable delay between a defendant's arrest and initial appearance. See 318 U.S. at 343-44. In Mallory the Supreme Court affirmed the holding of McNabb under Rule 5(a) of the Federal Rules of Criminal Procedure. See 354 U.S. at 455-56. Finding that the rule set forth in McNabb and Mallory was not required by the Constitution, the Eighth and Sixth Circuits had little difficulty concluding that Congress possessed the legislative authority to overrule both cases. See Pugh, 25 F.3d at 675; Christopher, 956 F.2d at 538-39.[19]

We begin our analysis then, with the Supreme Court's decision in Miranda. Several passages in Chief Justice Warren's opinion for the Court suggest that the warnings safeguard rights guaranteed by the

_____

[19] Interestingly, although this Court has not addressed the effect of § 3501 on either Miranda or McNabb /Mallory, we have repeatedly cited the provision when making voluntariness determinations without ever suggesting that any part of the section is unconstitutional. See, e.g., United States v. Braxton, 112 F.3d 777, 784 & n.* (4th Cir.) (en banc), cert. denied, 118 S. Ct. 192 (1997); United States v. Wilson, 895 F.2d 168, 172-73 (4th Cir. 1990); United States v. Pelton, 835 F.2d 1067, 1074 (4th Cir. 1987); United States v. Peoples , 748 F.2d 934, 936 (4th Cir. 1984); United States v. Gonzales, 736 F.2d 981, 983 (4th Cir. 1984); United States v. Dodier, 630 F.2d 232, 236 (4th Cir. 1980); United States v. Sauls, 520 F.2d 568, 569 (4th Cir. 1975); United States v. Johnson, 495 F.2d 378, 382 (4th Cir. 1974). Indeed, in United States v. Van Metre, 150 F.3d 339 (4th Cir. 1998), we recently held that a fifty-five hour delay between the defendant's arrest and arraignment did not render the defendant's confession inadmissible, without citing either McNabb or Mallory, because under the mandate of § 3501 such delay "is only one factor to be considered when determining the admissibility of a confession." Id. at 348-49.

34

Constitution. See, e.g., Miranda, 384 U.S. at 490 (noting that the privilege against self-incrimination is guaranteed by the Constitution). Surprisingly, the sixty-page opinion does not specifically state the basis for its holding that a statement obtained from a suspect without the warnings would be presumed involuntary. The Court strongly suggested, however, that the basis for the rule was identical to that set forth in McNabb and Mallory. See id. at 463. In particular, just as the "supervisory" rule set forth in McNabb and Mallory permitted the Court to avoid the constitutional issues associated with federal interrogations, see id., the rule set forth in Miranda would allow the Court to avoid the constitutional issues associated with state interrogations, see id.

Although the Court failed to specifically state the basis for its holding in Miranda, it did specifically state what the basis was not. At no point does the Court refer to the warnings as constitutional rights. Indeed, the Court acknowledged that the Constitution did not require the warnings, id. at 467, disclaimed any intent to create a "constitutional straightjacket," id., repeatedly referred to the warnings as "procedural safeguards," id. at 444, and invited Congress and the States "to develop their own safeguards for [protecting] the privilege," id. at 490.

Since deciding Miranda, the Supreme Court consistently (and repeatedly) has referred to the warnings as "prophylactic," New York v. Quarles, 467 U.S. 649, 654 (1984), and "not themselves rights protected by the Constitution," Michigan v. Tucker, 417 U.S. 433, 444 (1974); see also Davis v. United States, 512 U.S. 452, 457-58 (1994) (referring to Miranda warnings as "a series of recommended procedural safeguards" (internal quotation marks omitted)); Withrow v. Williams, 507 U.S. 680, 690-91 (1993) (acknowledging that "Miranda's safeguards are not constitutional in character"); Duckworth v. Eagan, 492 U.S. 195, 203 (1989) (noting that the Miranda warnings are not required by the Constitution); Connecticut v. Barrett, 479 U.S. 523, 528 (1987) (noting that "the Miranda Court adopted prophylactic rules designed to insulate the exercise of Fifth Amendment rights"); Oregon v. Elstad, 470 U.S. 298, 306 (1985) (noting that the Miranda exclusionary rule "may be triggered even in the absence of a Fifth Amendment violation"); Edwards v. Arizona, 451 U.S. 477, 492 (1981) (Powell, J., concurring) (noting that the

35

Court in Miranda "imposed a general prophylactic rule that is not manifestly required by anything in the text of the Constitution").

One of the first opinions construing Miranda was Harris v. New York, 401 U.S. 222 (1971). In Harris, the defendant, charged with selling heroin, made several statements to the police prior to receiving his Miranda warnings. See id. at 223-24. At trial, the defendant took the stand in his own defense. See id. at 223. During cross-examination, he was asked whether he had previously made any statements to the police that contradicted his direct testimony. See id. Although not admissible as substantive evidence, the Court held, per Chief Justice Burger, that the statements in question could be admitted for purposes of impeaching his credibility because, although obtained in technical violation of Miranda, the statements were made voluntarily. See id. at 224-25; cf. Mincey v. Arizona, 437 U.S. 385, 401-02 (1978) (holding that involuntary statements, as opposed to statements made in technical violation of Miranda, could not even be admitted for impeachment purposes).

In Tucker, the Supreme Court was asked to apply the "tainted fruits" doctrine from Wong Sun v. United States, 371 U.S. 471 (1963), to the testimony of a witness whose identity was discovered as the result of a statement obtained from the defendant in violation of Miranda. See 417 U.S. at 436-37. In declining to extend the "tainted fruits" doctrine to the facts in Tucker, the Court noted that the unwarned questioning did not abridge the defendant's Fifth Amendment privilege, "but departed only from the prophylactic standards later laid down by this court in Miranda to safeguard that privilege." 417 U.S. at 445-46. Because the defendant's constitutional rights were not infringed, the Court in Tucker determined that the "fruit of the poisonous tree" doctrine did not apply. Id. at 445-46 & n.19.

In Quarles, the Supreme Court was asked by the State of New York to recognize an emergency exception to Miranda. See 467 U.S. at 649. In that case, a young woman told two police officers that she had just been raped, that her assailant had just entered a nearby store, and that he was carrying a gun. After entering the store the officers quickly spotted the defendant. After a short chase, the defendant was caught and searched. Because he was wearing an empty shoulder holster, the arresting officer asked him, prior to reading him his Miranda

36

warnings, where the gun was located. <u>See id.</u> at 651-52. The defendant nodded in the direction of some empty cartons and stated, "the gun is over there." <u>Id.</u> at 652. Although obtained in technical violation of <u>Miranda</u>, the Government sought to introduce the defendant's statement in its case-in-chief. In recognizing an emergency exception to <u>Miranda</u>, the Supreme Court relied exclusively upon the fact that a violation of <u>Miranda</u> was not necessarily a violation of the Constitution. <u>See id.</u> at 654 (stating that "[t]he prophylactic <u>Miranda</u> warnings . . . are `not themselves rights protected by the Constitution'" (quoting <u>Tucker</u>, 417 U.S. at 444)); <u>see also</u> Saltzburg & Capra, <u>supra</u>, at 555-56 ("[I]f the <u>Miranda</u> safeguards were constitutionally required, then presumably any confession obtained in violation of them would have to be excluded -- even if the officer was faced with a situation where giving the safeguards may have posed a threat to public safety.").

When presented with another opportunity to extend the <u>Wong Sun</u> "tainted fruits" doctrine, the Supreme Court in <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985), once again declined the invitation to do so. In <u>Elstad</u>, two officers went to the defendant's home with a warrant for his arrest. <u>See id.</u> at 300. After executing the warrant, the officers questioned the defendant about his role in the burglary of a neighbor's house. <u>See id.</u> at 301. As a result of the interrogation, the defendant confessed to the burglary. <u>See id.</u> The defendant was then escorted to the police station where the officers advised him for the first time of his <u>Miranda</u> rights. After waiving his rights, the defendant once again confessed to the burglary. <u>See id.</u> Later, the defendant sought to suppress his second confession as the "fruit of the poisonous tree," arguing that it was obtained only as the result of his first confession that was made in violation of <u>Miranda</u>. <u>See id.</u> at 302. The <u>Elstad</u> majority, however, held that the "tainted fruits" doctrine did not apply to the second confession for the same reasons the doctrine did not apply in <u>Tucker</u>. <u>See id.</u> at 308. Specifically, the Court held that "[s]ince there was no actual infringement of the suspect's constitutional rights, the case was not controlled by the doctrine expressed in <u>Wong Sun</u> that fruits of a <u>constitutional</u> violation must be suppressed." <u>Id.</u> (emphasis added).

Of particular importance here, the Court in <u>Elstad</u> made the following observation about <u>Miranda</u>:

37

The Miranda exclusionary rule, however, serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself. It may be triggered even in the absence of a Fifth Amendment violation. The Fifth Amendment prohibits use by the prosecution in its case in chief only of compelled testimony. Failure to administer Miranda warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under Miranda. Thus, in the individual case, Miranda's preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.

But the Miranda presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted. Despite the fact that patently voluntary statements taken in violation of Miranda must be excluded from the prosecution's case, the presumption of coercion does not bar their use for impeachment purposes on cross-examination.

Id. at 306-07 (internal footnotes and citations omitted).

In light of the foregoing cases, it is certainly"well established that the failure to deliver Miranda warnings is not itself a constitutional violation." United States v. Elie, 111 F.3d 1135, 1142 (4th Cir. 1997) (citing Supreme Court cases); see also Correll v. Thompson, 63 F.3d 1279, 1290 (4th Cir. 1995) (holding that "a technical violation of Miranda [is not necessarily] a Fifth Amendment violation"). As a consequence, the irrebuttable presumption created by the Court in Miranda -- that a confession obtained without the warnings is presumed involuntary -- is a fortiori not required by the Constitution.[20]

_____

[20] Conclusive presumptions are"designed to avoid the costs of excessive inquiry where a per se rule will achieve the correct result in almost all cases." Coleman v. Thompson, 501 U.S. 722, 737 (1991). As the Supreme Court has explained in another context:"Per se rules . . . require the Court to make broad generalizations. . .. Cases that do not

38

Accordingly, Congress necessarily possesses the legislative authority to supersede the conclusive presumption created by Miranda pursuant to its authority to prescribe the rules of procedure and evidence in the federal courts. See Carlisle v. United States , 517 U.S. 416, 426 (1996); Vance v. Terrazas, 444 U.S. 252, 265 (1980); Palermo v. United States, 360 U.S. 343, 345-48 (1959); cf. Alfredo Garcia, Is Miranda Dead, Was It Overruled, Or Is It Irrelevant? , 10 St. Thomas L. Rev. 461, 461-65, 479 (1998) (concluding that§ 3501 "overruled Miranda" but arguing that Miranda was already dead).**21**

It is worth recalling that Congress not only acted in response to the Court's invitation, see Miranda, 384 U.S. at 490 (inviting Congress and the States "to develop their own safeguards for [protecting] the privilege"), but that the Court in Miranda  had acted in the absence of a relevant Act of Congress. It is well established that the Court's power to prescribe nonconstitutional "rules of procedure and evidence

_____

fit the generalization may arise, but a per se  rule reflects the judgment that such cases are not sufficiently common or important to justify the time and expense necessary to identify them." Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 50 n.16 (1977). It is apparent, therefore, that conclusive presumptions, like the one contained in Miranda, are dictated by convenience, not the Constitution.

**21** The dissent does not dispute that the applicability of § 3501 turns on whether Miranda is a constitutional rule. Even more telling, after considering the merits, the dissent is unable to conclude that Miranda's conclusive presumption is, in fact, required by the Constitution. In the end, the dissent poses only the following rhetorical question: "If Miranda is not a constitutional rule, why does the Supreme Court continue to apply it in prosecutions arising in state courts." Post at 50. As noted above, the Supreme Court has stated in unmistakable terms that the rule set forth in Miranda is not required by the Constitution. See ante at 35-38. In fact, in one of the Supreme Court's most recent applications of Miranda to a state court prosecution the Supreme Court specifically stated that "Miranda's safeguards are not constitutional in character." Withrow v. Williams, 507 U.S. 680, 690-91 (1993). Thus, although the dissent raises an interesting academic question, the answer to why the Supreme Court applies Miranda in prosecutions arising in state courts has no bearing on our conclusion that Miranda's conclusive presumption is not required by the Constitution.

for the federal courts exists only in the absence of a relevant Act of Congress." Palermo, 360 U.S. at 353 n.11. Thus, just as the Court was free to create an irrebuttable presumption that statements obtained without certain procedural safeguards are involuntary, Congress was free to overrule that judicially created rule.

To be sure, the Miranda warnings were meant to safeguard the Fifth Amendment privilege against self-incrimination. Indeed, under § 3501 any statement obtained in violation of the privilege must be suppressed. Thus, we cannot say that Congress's decision to eliminate the irrebuttable presumption created by Miranda lessens the protections afforded by the privilege. Indeed, the Court has recognized that Miranda's irrebuttable presumption goes beyond what is required to protect the privilege. As a result, even "patently voluntary statements . . . must be excluded." Elstad, 470 U.S. at 307. In enacting § 3501, Congress simply recognized the need to offset the harmful effects created by Miranda's irrebuttable presumption. **22** Cf. Sandstrom v.

_____

**22** In addition to recognizing the harmful effects created by Miranda's irrebuttable presumption, Congress concluded that the Court's justification for the conclusive presumption -- that custodial interrogations were inherently coercive and intimidating -- was simply incorrect as an empirical matter. See S. Rep. No. 90-1097 (1968), reprinted in 1968 U.S.C.C.A.N. 2112. During the subcommittee hearings, Senator Arlen Specter, then the district attorney of the City of Philadelphia, pointed out

> that the so-called third-degree methods deplored by the Supreme Court and cited as a basis for their opinion in Miranda is not a correct portrayal of what actually goes on in police stations across the country. While there are isolated cases of police using coercive tactics, this is the exception rather than the rule.

Id. at 2134. Similarly, the final committee report concluded that the basis for the conclusive presumption in Miranda was faulty. Id. at 2142 (noting that the "data supporting the [Court's] conclusion of inherent coercion in custodial interrogation were drawn solely from police manuals and texts which may or may not have been followed"); id. at 2134 (noting that "while . . . coercive practices might have been approved 30 years ago, they have no place in modern police techniques"); id. (finding that "the Court overreacted to defense claims that police brutality is widespread").

In sum, Congress, utilizing its superior fact-finding ability, concluded that custodial interrogations were not inherently coercive. As Senator Sam Ervin noted at the time § 3501 was enacted:

Montana, 442 U.S. 510, 523 (1979) (recognizing the harmful effects created by the use of mandatory conclusive presumptions in criminal cases). No longer will criminals who have voluntarily confessed their crimes be released on mere technicalities.

Finally, lest there be any confusion on the matter, nothing in today's opinion provides those in law enforcement with an incentive to stop giving the now familiar Miranda warnings. As noted above, those warnings are among the factors a district court should consider when determining whether a confession was voluntarily given. See 18 U.S.C.A. § 3501(b). Indeed, federal courts rarely find confessions obtained in technical compliance with Miranda to be involuntary under the Fifth Amendment. Cf. Elie, 111 F.3d at 1143 (noting "that very few incriminating statements, custodial or otherwise, are held to be involuntary" (internal quotation marks omitted)). Thus, providing

_____

> A decision of the Supreme Court, if it is based on a factual assumption which is incorrect, may be subject to Congress' power to legislate. The Supreme Court has no right to make . . . determinations based on unsound factual assumptions. I don't believe the great majority of law enforcement officers in the United States are such disreputable people that they have to have the criminals protected against them.

Hearings on the Supreme Court Before the Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary, 90th Cong. 25 (1968). Senator Ervin's observation concerning Congress's authority to overrule Supreme Court decisions, whether or not correct as a general matter, is certainly correct when applied to judicially created presumptions. See ante note 20. It is well established that a conclusive presumption "should not be applied . . . in situations where the generalization is incorrect as an empirical matter." Coleman v. Thompson, 501 U.S. 722, 737 (1991). In fact, "the justification for a conclusive presumption disappears when application of the presumption will not reach the correct result most of the time." Id. According to congressional findings, the basis for Miranda's conclusive presumption is incorrect as an empirical matter, and the presumption does not reach the correct result, i.e., suppressing only coerced confessions, most of the time that it is applied. As a result, Congress, pursuant to its authority to prescribe the rules of procedure and evidence in the federal courts, was justified in abandoning the conclusive presumption when it enacted § 3501.

41

the four Miranda warnings is still the best way to guarantee a finding of voluntariness.

In the end, and after an exhaustive review of the relevant authority, we are convinced that § 3501 -- enacted at the invitation of the Supreme Court and pursuant to Congress's unquestioned power to establish the rules of procedure and evidence in the federal courts -- is constitutional. We are reassured in our conclusion by the fact that our dissenting colleague, after examining all of the relevant authority at his disposal, has been unable to conclude differently. At best, the dissent can but pose a rhetorical question concerning the constitutionality of § 3501. See ante note 21. Apparently, all of the relevant authority of which the dissent is aware supports the conclusion we reach today. As a consequence, we have no difficulty holding that the admissibility of confessions in federal court is governed by § 3501, rather than the judicially created rule of Miranda.

2.

Having concluded that § 3501, rather than Miranda, governs the admissibility of confessions in federal court, our next step ordinarily would be to remand the case for a determination of whether Dickerson's confession was voluntary. That is unnecessary in this case, however, because the district court has already made that finding.

Although the district court suppressed the statements obtained in violation of Miranda, it nevertheless denied Dickerson's motion to suppress the evidence found as a result thereof, e.g., the statement made by Rochester identifying Dickerson as the getaway driver. In making this determination, the district court stated that it was bound by this Court's decision in United States v. Elie, 111 F.3d 1135 (4th Cir. 1997). See United States v. Dickerson, 971 F. Supp. 1023, 1024 n.1 (E.D. Va. 1997). In Elie, we held that evidence found as a result of a statement made in violation of Miranda may only be suppressed if the statement was involuntary within the meaning of the Due Process Clause of the Fifth Amendment. Therefore, by declining to suppress the evidence found as a result of Dickerson's unwarned statements, the district court necessarily found that Dickerson's statements were voluntary under the Fifth Amendment.

42

During oral argument, Dickerson's counsel contended that the district court erred in finding that the statements in question were voluntary for purposes of the Fifth Amendment. The district court's finding on this matter, however, is currently unreviewable. See, e.g., United States v. Becker, 23 F.3d 1537, 1539 (9th Cir. 1994) (noting that the denial of a motion to suppress is not an appealable final order).

IV.

On appeal, the Government also contends that the district court erred in suppressing the fruits of the warrant-authorized search of Dickerson's apartment. The district court concluded that the warrant was insufficiently particular in describing the items to be seized. Moreover, the district court concluded that the agents executing the warrant could not have acted in good-faith because the warrant was facially deficient. We address these two rulings in turn.

A.

The warrant in question was obtained by Special Agent Lawlor via the telephone pursuant to Rule 41(c)(2) of the Federal Rules of Criminal Procedure. In his sworn oral testimony to Judge Kenkel, Special Agent Lawlor described the circumstances of the bank robbery, including that the robber used a handgun, carried a bag, requested unmarked bills, and left the scene in a car registered to Dickerson. In the section of the warrant used to identify the property to be seized, Special Agent Lawlor wrote: "Evidence of the crime of bank robbery." Whether that description, coupled with the description contained in Special Agent Lawlor's oral testimony, is sufficiently particular to pass constitutional scrutiny is a legal issue subject to de novo review. See United States v. Hyppolite, 65 F.3d 1151, 1156 (4th Cir. 1995).

The Fourth Amendment provides that a search warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Supreme Court has identified two important purposes underlying the particularity requirement: (1) preventing general searches, and (2) ensuring that the executing officer is able to distinguish between those items which are to be

43

seized and those that are not. See Marron v. United States, 275 U.S. 192, 196 (1927).

The Government argues that the warrant neither authorized an improper general search nor left to the discretion of the agents executing the warrant what to seize. Specifically, the Government contends that the warrant directed the agents to search for evidence of a particular crime -- bank robbery -- that tends to generate quite distinctive evidence, e.g., guns, masks, bait money, dye-stained bills and clothes, carrying bags. The test for the necessary particularity of a search warrant is "a pragmatic one: The degree of specificity required when describing the goods to be seized may necessarily vary according to the circumstances and type of items involved." United States v. Torch, 609 F.2d 1088, 1090 (4th Cir. 1979) (internal quotation marks omitted).

Some courts uphold warrants that identify the items to be seized as "evidence of [specific crime]" only "where a more precise description was not possible in the circumstances." United States v. George, 975 F.2d 72, 76 (2d Cir. 1992) (citing cases). Here, the Government admits, as it must, that it could have been more precise, but argues that this Court has routinely upheld warrants directing the police to search for evidence of a particular crime. See Appellant's Br. at 36-37 (citing United States v. Fawole, 785 F.2d 1141, 1144 (4th Cir. 1986), and United States v. Ladd, 704 F.2d 134 (4th Cir. 1983)).

As the Government correctly notes, the law of this Circuit does allow some discretion to the officers executing a search warrant, so long as the warrant at least minimally "confines the executing officers' discretion by allowing them to seize only evidence of a particular crime." Fawole, 785 F.2d at 1144. For example, in Ladd we upheld a warrant directing the police to seize all property relating to "the smuggling, packing, distribution, and use of controlled substances," as satisfying fully the particularity requirement. 704 F.2d at 136. Indeed, the panel in Ladd specifically held that "[m]ore specificity is not required by the Constitution." Id. ; see also 2 Wayne R. LaFave, Search and Seizure § 4.6(d), at 567 & n.81 (3d ed. 1996) (noting that "[s]ometimes a warrant will not attempt to describe instrumentalities except by reference to the criminal conduct in which they have been used") (collecting cases).

44

As explained by the Second Circuit in George, a warrant authorizing a search for evidence relating to "a broad criminal statute or general criminal activity" such as "wire fraud," "fraud," "conspiracy," or "tax evasion," is overbroad because it "provides no readily ascertainable guidelines for the executing officers as to what items to seize." 975 F.2d at 76. In contrast, a warrant authorizing a search for evidence relating to "a specific illegal activity," such as "narcotics," or "theft of fur coats" is sufficiently particular. Id. (citing cases). The warrant in the instant case limited the agents' search to evidence relating to the commission of a particular crime: bank robbery. Bank robbery is a specific illegal activity that, as the Government notes, generates quite distinctive evidence. Though certainly broad in its description, we cannot say that the warrant failed to provide that degree of specificity required by the precedent of this Court.

The search of Dickerson's apartment produced a silver .45 caliber handgun, dye-stained money, a bait bill from another robbery, ammunition, masks, and latex gloves.[23] Rather than conducting an impermissible fishing expedition, it is clear that the agents conducting the search only seized those items reasonably associated with the crime of bank robbery. Thus, it is evident that the warrant was sufficiently definite so that the agents executing it were able to identify the property sought with reasonable certainty. As a consequence, we conclude that "evidence of the crime of bank robbery" adequately distinguishes between those items which are to be seized and those which are not. See Marron, 275 U.S. at 196.

In sum, the nature of a bank robbery is such that the evidence thereof is reasonably subject to identification. Since "[t]he degree of specificity required when describing the goods to be seized . . . var-[ies] according to the . . . type of items involved," Torch, 609 F.2d at 1090, we have little difficulty concluding that the warrant was sufficiently particular in describing the items to be seized.

B.

Moreover, even if we assume that the warrant was not sufficiently

_____

[23] The agents also found a small quantity of drugs in plain view.

45

particular in describing the items to be seized, we nevertheless would conclude that the evidence obtained during the search of Dickerson's apartment was admissible pursuant to the good faith exception to the exclusionary rule. See United States v. Leon, 468 U.S. 897, 913 (1984). In deciding whether the good faith exception applies, this Court must consider "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Id. at 922 n.23. This inquiry is objective in nature, depending upon the understanding of a reasonable officer in light of the totality of the circumstances. See Hyppolite, 65 F.3d at 1156.

In light of the totality of the circumstances, we conclude that the warrant in this case was not so facially deficient as to preclude reasonable reliance upon it. First, the warrant specified that the items to be seized consisted of evidence associated with bank robbery. Thus, it did not fail to provide the searching officers any guidance whatsoever as to the subject of the search.

Second, this Court considers the knowledge of the searching officers in assessing the objective reasonableness of reliance upon a warrant. See United States v. Curry, 911 F.2d 72, 78 (8th Cir. 1990) (noting that "in assessing whether reliance on a search warrant was objectively reasonable under the totality of the circumstances, it is appropriate to take into account the knowledge that an officer in the searching officer's position would have possessed"). Agent Wenko, who was the lead agent during the search of Dickerson's apartment, was familiar not only with the specifics of the bank robbery in question, but, perhaps as important, had been investigating bank robberies for seven years and thus was very familiar with the type of evidence to look for (e.g., guns, money, bait bills, dye-stained money and clothes, disguises, carrying bags, and gloves).

For the foregoing reasons, we conclude that the district court erred in finding that the agents could not have acted in good-faith reliance on the warrant.

V.

In conclusion, we find that the admissibility of confessions in federal court is governed by 18 U.S.C.A. § 3501 (West 1985), rather than

46

Miranda, that the warrant was sufficiently particular in describing the items to be seized, and that the officers executing the warrant acted in good faith. Accordingly, the district court's order suppressing the statements Dickerson made at the FBI Field Office and the physical evidence obtained during the search of his apartment is reversed, and the case is remanded for further proceedings.

REVERSED AND REMANDED

MICHAEL, Circuit Judge, dissenting in part and concurring in part:

Thirty years have passed since Congress enacted 18 U.S.C. § 3501 in reaction to Miranda. We are nearing the end of the seventh consecutive Administration that has made the judgment not to use § 3501 in the prosecution of criminal cases. Now, after all this time, the majority supplants the Department of Justice's judgment with its own and says that § 3501 must be invoked. After making that judgment call, the majority holds that the section is constitutional, without the benefit of any briefing in opposition. In pressing § 3501 into the prosecution of a case against the express wishes of the Department of Justice, the majority takes on more than any court should. I therefore respectfully dissent from the parts of the majority opinion that deal with § 3501. As for the search warrant, I would uphold it under Leon's good faith exception, but I dissent from the holding that the warrant is sufficiently specific.

I.

The majority begins its reach to inject § 3501 into this case with an overstatement. It says that the § 3501 issue is "squarely presented." Ante at 2; see also ante at 4 ("the question of whether § 3501 governs the admissibility of confessions in federal court is squarely before us today"). In its brief to us the government has said plainly, "we are not making an argument based on § 3501 in this appeal." Appellant's Opening Br. at 34. The defendant, of course, does not mention § 3501. Thus, we are not being urged to inject § 3501 into this case by anyone except the amici, the Washington Legal Foundation and the Safe Streets Coalition. That is not enough to put the issue of § 3501's constitutionality and application squarely before us. Perhaps

47

the majority recognizes as much, for it quickly moves to an argument about why the court itself should force § 3501 into this case.

The majority's argument for taking up § 3501 is as follows. First, the Department of Justice will not defend the constitutionality of § 3501, so the question whether the statute or <u>Miranda</u> governs the admission of federal confessions will not be decided unless we act on our own. Second, Dickerson's confession in this case is admissible under § 3501 but not under <u>Miranda</u>."As a result," the majority concludes, "we are <u>required</u> to consider the issue now." Ante at 26 (emphasis added). One thing I am sure of is that we are not required to consider a § 3501 issue when it is raised only in an <u>amicus</u> brief. <u>See Davis v. United States</u>, 512 U.S. 452, 457 n.* (1994) ("declin[ing] the invitation of some <u>amici</u> to consider" § 3501). Indeed, the only issues not raised by the parties that we are required to consider are those of subject matter jurisdiction and justiciability. <u>See e.g.</u>, <u>Mt. Healthy City School District Board of Education v. Doyle</u>, 429 U.S. 274, 278 (1977) ("we are obliged to inquire <u>sua sponte</u> whenever a doubt arises as to the existence of federal jurisdiction"); <u>Juidice v. Vail</u>, 430 U.S. 327, 331 (1977) ("Although raised by neither of the parties, we are first obliged to examine the standing of appellees, as a matter of the case-or-controversy requirement associated with Art. III"); <u>LaFaut v. Smith</u>, 834 F.2d 389, 394-95 n.9 (4th Cir. 1987) (concluding that whether a claim is moot "is a jurisdictional question that the court is obliged to consider <u>sua sponte</u> whenever it arises") (citations omitted). We have jurisdiction in this case, and it is fit for adjudication. The real question, therefore, is whether we should exercise our discretion and consider § 3501, when no party has invoked the statute. I believe that the situation calls for the exercise of judicial restraint; we should stay away from the § 3501 issue.

To start with, I cannot agree with the majority's accusation that the Department of Justice "elevat[ed] politics over law" when it prevented the United States Attorney from invoking § 3501 in an effort to save Dickerson's confession. <u>See</u> ante at 4. A move to admit more confessions could be touted as aggressive prosecution, so I would think it might be better politics to invoke § 3501. In any event, I see no evidence that the Department of Justice is putting politics over law when it comes to § 3501. The Department's view-- that § 3501 cannot be

48

used to admit confessions that Miranda would exclude -- is a view that I accept as genuine.

I believe that Davis v. United States, 512 U.S. 452 (1994), remains sound authority for us to decline consideration of§ 3501 on the invitation of an amicus. In Davis the Court did not take up § 3501 because "the issue is one of first impression involving the interpretation of a federal statute on which the Department of Justice expressly declines to take a position." Id. at 457 n.*. Our panel majority says that everything has changed since Davis because the Attorney General has now written Congress, saying that the Department of Justice will not defend the constitutionality of § 3501. See ante at 3-4, 25. I do not think the Attorney General's letter changes anything. It simply confirms what the Supreme Court already knew in Davis, that is, that the Department of Justice was not going to invoke the statute to try to salvage confessions. See Davis, 512 U.S. at 463 (Scalia, J., concurring) ("This is not the first case in which the United States has declined to invoke § 3501 before us -- nor even the first case in which that failure has been called to its attention."). The majority also contends that Davis is distinguishable because the Supreme Court saved that confession on another ground, making consideration of § 3501 unnecessary. That is not why the Court declined to consider § 3501. The Court said specifically "that the Government has not sought to rely in this case on 18 U.S.C. § 3501, . . . and we therefore decline the invitation of some amici to consider it." Davis, 512 U.S. at 457 n.*. See also id. at 462 n.* ("the Court today bases its refusal to consider § 3501 not upon the fact that the provision is inapplicable, but upon the fact that the Government failed to argue it") (Scalia, J., concurring). Thus, we are faced with essentially the same situation that the Supreme Court confronted in Davis when it refused to take up § 3501: the government has expressly declined to "mak[e] an argument based on § 3501 in this appeal," Appellant's Opening Br. at 34, and we are free to reject amici's call for its consideration.

It is a mistake for our court to push § 3501 into this case for several reasons. First, courts as a general rule do not interfere with the executive's broad discretion in the initiation and conduct of criminal prosecutions. See generally United States v. Armstrong, 116 S. Ct. 1480, 1486 (1996); United States v. Juvenile Male J.A.J., 134 F.3d 905, 907 (8th Cir. 1998). Forcing the use of § 3501 upon a United States Attor-

49

ney gets uncomfortably close to encroaching upon the prosecutor's routine discretion. I recognize, of course, that courts have a large measure of control over the course of a case once it is filed. But a decision not to invoke § 3501 in response to a motion to suppress a confession is a matter of prosecutorial strategy. We should leave that to the executive. There is also a related point. In invoking § 3501, the majority overrides 30 years of Department of Justice prosecutorial policy. Any change in this policy should come from Justice.

Second, it is "a sound prudential practice" for us to avoid issues not raised by the parties. See Davis, 512 U.S. at 464 (Scalia, J., concurring). This is because "[t]he premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." Carducci v. Regan, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.). We perform our role as neutral arbiter best when we let the parties raise the issues, and both sides brief and argue them fully. That did not happen here. By invoking § 3501, the majority injects into this case the overriding constitutional question of whether § 3501 can supersede Miranda. It then decides the question against the defendant, when the only briefing we have on the issue is about two pages from amici that the majority agrees with. The majority holds that § 3501 governs the admissibility of confessions in federal court because Miranda is not a constitutional rule. I don't know whether it is or not, but before I had to decide, I would want thoughtful lawyers on both sides to answer one question for me. If Miranda is not a constitutional rule, why does the Supreme Court continue to apply it in prosecutions arising in state courts? See, e.g., Stansberry v. California, 511 U.S. 318 (1994) (per curiam); see also Mu'Min v. Virginia, 500 U.S. 415, 422 (1996) (noting that with respect to cases tried in state court, the Supreme Court's "authority is limited to enforcing the commands of the United States Constitution"). This question illustrates that the § 3501 issue is so sweeping that we should not be delving into it on our own. In this case, we should follow our usual practice of deciding only the issues raised by the parties.*

_____
*The majority misses my point when it erroneously suggests that I have examined all of the relevant authority and cannot conclude that

The majority's fallback position is that if we do not press the use of § 3501, no one else will. See ante at 26. This overlooks Congress. If another branch is to question and investigate the executive's 30-year policy of not using § 3501, it should be Congress. After all, Congress -- consistent with separation of powers principles -- uses the public hearings process to examine the policies and conduct of the executive. That process has been used on occasion to question the executive's exercise of prosecutorial discretion and the formulation of litigation strategy. See Ameron, Inc. v. United States Army Corps of Engineers, 809 F.2d 979, 991 n.8 (3d Cir. 1986). Congress therefore may legitimately investigate why the executive has ignored § 3501 and what the consequences are. The legislative branch is better equipped than we are to investigate, for example, the question raised by Justice Scalia in his concurring opinion in Davis: whether the government's failure to invoke § 3501 "may have produced . . . the acquittal and the nonprosecution of many dangerous felons." Davis, 512 U.S. at 465 (emphasis added). Whether the answer to that question or other considerations should be used to prod the executive into changing its policy with respect to § 3501 is a matter that I would leave to Congress.

Because I would not invoke § 3501, I would affirm the district court's order denying the government's motion to reconsider the admissibility of Dickerson's confession for the reasons stated in part II.A. of the majority opinion.

II.

As for the physical evidence seized from Dickerson's apartment, I agree with the majority's conclusion that it should have been admitted

_____

Miranda renders § 3501 unconstitutional. See ante at n.21, 42. My point is that we should not be examining the question at all, much less deciding it. For the record, however, not everyone agrees with the majority. See 1 Charles Alan Wright, Federal Practice and Procedure § 76 (2d ed. 1982) ("Unless the [Supreme] Court overrules Miranda, or holds that the 1968 statute [§ 3501] has successfully accomplished this, lower courts must follow the decision rather than the statute."); 1 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 6.5(e) (1984) (§ 3501 "is unconstitutional to the extent that it purports to repeal Miranda.").

under the good faith exception. I respectfully disagree, however, with the majority's conclusion that a warrant permitting a search for "evidence of the crime of bank robbery" is sufficiently particular under the Fourth Amendment.

A warrant must guide the executing officer with a particular description of the items to be seized. See United States v. Wolfenbarger, 696 F.2d 750, 752 (10th Cir. 1982) ("A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized.") (citation omitted). Thus, a warrant authorizing seizure of "address books, diaries, business records, documents, receipts, warranty books, guns, stereo equipment, [and] color television which are evidence of violation of Georgia State Statute 16-8-2 Theft by Taking" is sufficiently particular because it identifies the universe of items to be seized. See United States v. Fawole, 785 F.2d 1141, 1144 (4th Cir. 1986). On the other hand, a warrant for seizure of "`any other evidence relating to the commission of a crime' plainly is not sufficiently particular with respect to the things to be seized." United States v. George, 975 F.2d 72, 75 (2d Cir. 1992).

I recognize that courts on occasion have upheld warrants authorizing the seizure of the "instrumentalities" of certain distinctive crimes. Nevertheless, I believe "evidence of the crime of bank robbery" is far too general. That description does nothing to confine the discretion of an executing officer, especially if the warrant is relayed for execution by an officer who has never served on a bank robbery squad. A search for evidence of bank robbery would surely include a search for guns, masks, and cash. But what else? It might be construed to allow a search through all financial records, as well as a search for any items purchased. Under this interpretation, virtually no piece of paper or property would be beyond the bounds of a search. The description in the warrant here was simply too general to satisfy Fourth Amendment standards.

52